[Cite as *In re A.M.*, 2017-Ohio-7653.]

STATE OF OHIO ) IN THE COURT OF APPEALS
)ss: NINTH JUDICIAL DISTRICT
COUNTY OF LORAIN )

IN RE: A.M.
     R.M.
     I.A.

C.A. No.      16CA010995


APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE Nos.    14 JC 42939
             14 JC 42940
             14 JC 42941

DECISION AND JOURNAL ENTRY

Dated: September 18, 2017

---

CARR, Presiding Judge.

{¶1} Appellant Mother appeals the judgment of the Lorain County Court of Common Pleas, Juvenile Division, that awarded legal custody of her three children to their maternal great aunt and uncle ("Aunt" and "Uncle"). This Court affirms.

I.

{¶2} Mother is the biological mother of A.M. (d.o.b. 11/13/05), R.M. (d.o.b. 2/25/09), and I.A. (d.o.b. 4/20/10).[1] Father V. is the established father of A.M. Father A. is the established father of I.A. Paternity of R.M. has not been established, and Mother has not identified any man who might be that child's father. None of the fathers are parties to this appeal.

---

[1] Mother also has two older children (B.M. and A.H.) who were subjects of agency complaints seeking temporary custody to those children's father. In addition, Mother testified that she has a sixth child who has been in the legal custody of her maternal grandmother since infancy, but there was no other information about her. These three children are not subjects of this appeal.

**{¶3}** In July 2014, Lorain County Children Services ("LCCS") filed complaints alleging the children to be neglected and dependent, based on lack of adequate parental care because of the faults or habits of the parents (R.C. 2151.03(A)(2)); neglect or refusal to provide proper or necessary care (R.C. 2151.03(A)(3)); and conditions or environment warranting the state, in the interests of the children, in assuming their guardianship (R.C. 2151.04(C)). The complaint further sought an award of temporary custody to Aunt and Uncle. After an adjudicatory hearing, all three children were adjudicated neglected and dependent. After bifurcated dispositional hearings, A.M., R.M., and I.A. were all placed in the temporary custody of Aunt and Uncle with an order of protective supervision by LCCS. The juvenile court adopted the agency's proposed case plan and made it an order of the court.

**{¶4}** By March 2015, Aunt and Uncle had filed motions for legal custody of the three children. At the annual review hearing in July 2015, the magistrate noted that LCCS supported an award of legal custody to relatives, because reunification was not possible as Mother had not complied with her case plan objectives. The juvenile court maintained the children in the temporary custody of Aunt and Uncle at that time, retaining protective supervision by the agency.

**{¶5}** The final dispositional hearing took place before the magistrate over three days in May, July, and August 2015. In early September 2015, the magistrate issued a decision granting legal custody to Aunt and Uncle and terminating the order of protective supervision. The juvenile court adopted the decision the same day. Mother filed objections to the magistrate's decision.[2] Mother supplemented her objections after obtaining a transcript of the dispositional

---

[2] Mother filed objections 15 days after the filing of the decision. Although her objections appear to have been untimely pursuant to Juv.R. 40(D)(3)(b)(i), the magistrate's decision did not contain the required conspicuous notice pursuant to Juv.R. 40(D)(3)(a)(iii) regarding the filing of

hearings. She limited her objections to challenging the magistrate's finding that an award of legal custody to Aunt and Uncle was in the best interest of the children. Specifically, Mother argued that the evidence demonstrated that she was an appropriate caregiver for the children while Aunt and Uncle were not. She raised no objection to the finding that LCCS had used reasonable efforts to prevent the removal of the children and eliminate their continued removal from the home. Both Aunt and Uncle and LCCS filed briefs in opposition to Mother's objections.[3]

{¶6} On January 4, 2016, the juvenile court issued its judgment overruling Mother's objections and awarding legal custody of A.M., R.M., and I.A. to Aunt and Uncle. The trial court further ordered, inter alia, supervised visitation for Mother and Father V. On August 5, 2016, Mother filed her notice of appeal. After requiring briefing by the parties regarding the timeliness of the appeal, this Court provisionally found that we had jurisdiction to consider Mother's appeal. LCCS has argued again in its appellee's brief that Mother's appeal is untimely filed. However, the agency has not raised any additional grounds or arguments to cause this Court to revisit our preliminary finding of jurisdiction. Because we have concluded that Mother timely filed her notice of appeal on August 5, 2016, this Court has jurisdiction to consider the merits of her appeal. Mother raises three assignments of error for review. We rearrange and consolidate some assignments of error to facilitate review.

II.

---

objections. Instead, in contravention to the rules, the court appended such notice to its judgment entry adopting the magistrate's decision. Accordingly, in the absence of the requisite notice on the magistrate's decision regarding the filing of objections, we cannot say that Mother's objections were untimely. Moreover, no party challenged the timeliness of the objections.

[3] Father V.'s attorney filed a brief in response to Mother's objections, asserting that Father V.'s position was unknown due to his client's failure to contact him regarding the objections.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FINDING THAT THE AGENCY MADE REASONABLE EFFORTS TO PREVENT THE CONTINUED REMOVAL OF THE CHILDREN FROM THE HOME.

{¶7} Mother argues that LCCS did not use reasonable efforts to reunify the children with Mother. The assignment of error is not well taken.

{¶8} Mother failed to preserve this issue for appeal by failing to object to the magistrate's finding that the agency used reasonable efforts to prevent the continued removal of the children from Mother's home. Although Mother filed objections to the magistrate's decision, she limited her objections to challenging the weight of the evidence on the issue of the best interest of the children.

{¶9} Juv.R. 40(D)(3)(b)(iv) provides:

Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Juv.R. 40(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b).

Therefore, "[w]hen a party fails to raise an issue in the party's objections to the magistrate's decision, it may not be raised for the first time on appeal." *Varner v. Varner*, 9th Dist. Wayne No. 06CA0024, 2007-Ohio-675, ¶ 22. As Mother failed to challenge the agency's use of reasonable efforts in her objections, this Court cannot address that issue on appeal.

{¶10} Moreover, Mother has not alleged plain error. We decline to undertake such an analysis on her behalf. *See State v. Bowerman*, 9th Dist. Medina No. 13CA0059-M, 2014-Ohio-4264, ¶ 16. Mother's second assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT'S DECISION TO GRANT LEGAL CUSTODY TO [AUNT AND UNCLE] RATHER THAN ALLOW FOR A SIX-MONTH

EXTENSION OF TEMPORARY CUSTODY CONSTITUTED AN ABUSE OF DISCRETION, AS IT WAS NOT IN THE CHILDREN'S BEST INTERESTS TO BE PLACED IN THE LEGAL CUSTODY OF [AUNT AND UNCLE] AND WAS IN THE CHILDREN'S BEST INTERESTS TO ALLOW MOTHER TO HAVE AN EXTENSION OF TIME TO COMPLETE HER CASE PLAN.

### ASSIGNMENT OF ERROR III

THE TRIAL COURT'S JUDGMENT GRANTING LEGAL CUSTODY OF THE CHILDREN TO [AUNT AND UNCLE] AND DENYING MOTHER'S REQUEST FOR A SIX-MONTH EXTENSION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶11}** In her first and third assignments of error, Mother argues that the juvenile court's award of legal custody to Aunt and Uncle was contrary to the best interest of the children and against the manifest weight of the evidence. This Court disagrees.

> On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest. Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

(Internal citations and quotations omitted.) *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

**{¶12}** In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶13} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. In that regard, the juvenile court is guided by the best interest factors enunciated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 9th Dist. Summit Nos. 26976, 26977, 2014-Ohio-2748, ¶ 16. In addition, the juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850, 15CA010860, 2017-Ohio-1, ¶ 17. While some factors overlap with those above, others include the child's adjustment to her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶14} LCCS had received numerous referrals concerning a lack of supervision, domestic violence issues, substance abuse, mental health issues, and a failure to meet the children's basic needs in Mother's home. In fact, Mother admitted that LCCS had been involved in her life and

the lives of her various children for 15 years. Before filing the complaints in this case, the agency was able to create a safety plan for the children by enlisting the help of Aunt and Uncle. After Mother's boyfriend broke into Aunt's and Uncle's house shortly thereafter, the agency filed their complaints based on ongoing concerns arising out of Mother's lifestyle and choices.

{¶15} A.M. was almost 10 years old at the conclusion of the legal custody hearing. He had been primarily in Aunt's and Uncle's care and physical custody since the age of two, and there was a strong bond among the three. All three children have been placed with Aunt and Uncle since June 2014, where all their basic needs are being met. The two older children attend parochial school, where they excel academically and participate in extracurricular sports. As a retired school athletic director, Aunt encourages the children's participation in physical activities; and the children reportedly enjoy all the activities in which they are enrolled. I.A. has some developmental disabilities arising from a stroke during infancy. Although he experiences some paralysis in one leg, limited movement in one hand, and difficulty speaking, he too is encouraged by Aunt and Uncle to participate in sports and other physical activity, which has significantly improved his mobility.

{¶16} A neighbor described Aunt and Uncle as good influences on the children based on her observations of their interactions. She testified that Uncle and A.M. appear to be good "buddies." Since the children's placement with Aunt and Uncle, the neighbor noted the stark change in I.A.'s behavior. When he first arrived, I.A. seemed "feral." After a short time in the care of Aunt and Uncle, the child ceased "growl[ing]" and began to hug people.

{¶17} Mother raised concerns that Aunt and Uncle use harsh disciplinary measures, including corporal punishment, on the children. Aunt and Uncle asserted that the children lacked any discipline or guidance in Mother's home. Uncle testified that A.M. is a reasonable child, and

that verbal reprimands are generally adequate to correct his behavior. Uncle admitted using corporal punishment, specifically a "swat" on their "bottoms" when they put themselves or others in danger. For example, when I.A. rode his three-wheeler into the road, Uncle spanked him. Aunt admitted to slapping R.M.'s face on one occasion after the child had begun screaming hysterically. Aunt testified that that was the only time she had ever hit any of the children. Although this Court has concerns and does not countenance slapping a child in the face, this appears to have been an isolated incident. After investigating these allegations, neither the caseworker nor the guardian ad litem were concerned that Aunt or Uncle had abused the children or acted in an inappropriately harsh manner. There was one additional incident in which I.A. presented with a cut on his leg. Uncle explained that that occurred as the child played outside. There was no evidence to the contrary. In addition, none of the children ever reported to the caseworker or guardian ad litem that Aunt or Uncle was hitting or otherwise physically harming them.

{¶18} Mother further raised a concern that Uncle drank a lot, smoked marijuana, and had a felony conviction. Uncle admitted that he will drink a beer or two in front of the children if he is grilling food outside. He also admitted that he had smoked marijuana when he was younger and in school. Uncle was 61 years old when he testified. LCCS asked Uncle to submit to a drug screen. The results of the screen were negative. Finally, Uncle admitted that he had served six months in prison for conversion of government property to private use. He had no convictions for any violent offenses.

{¶19} Mother was permitted to have one two-hour supervised visitation with the children at the agency. As of the first day of hearing, Mother had been sporadically exercising her visitation at LCCS. The caseworker described the visits as inconsistent and chaotic,

especially when Mother's two older children were included in the visits, and Mother had to split her attention amongst five children. The guardian reported that B.M. and A.H. often "oversaw" their three younger siblings during early visits, when Mother proved incapable of monitoring all the children at once. Mother was more focused on her cell phone than on interacting with the children, often slipping away to speak on the phone in private when she was supposed to be monitoring the children in the bathroom. When she did attend to the children, Mother would focus her attention on only one child at a time. She did not readily engage the children when they acted out; but when she did, she yelled at them instead of correcting their behavior.

{¶20} The guardian ad litem reported that Mother brought an unidentified baby to one of the visitations, when she should have been focusing on her own children. On the second day of hearing, the guardian reported that Mother had missed so many of her 46 scheduled visits that it was hard to fathom that she wanted to parent the children. By the time of the third day of hearing, Mother had ceased visiting with the children at the agency, coordinating instead with Aunt to arrange for her to supervise Mother's visits at a private location. Although Aunt was not under any obligation to allow and supervise such visitation, she cooperated with Mother to allow her time to visit with the children. Aunt described some of Mother's visits with the children as great, while others were not. Aunt testified that Mother verbally threatens the children when they misbehave, but otherwise Mother provides no discipline.

{¶21} Father V. had no interaction with A.M. prior to this case. At first visitations went well. Father V. was appropriate and engaged with the child. As time went on and tensions developed between Father V. and his parents who supervised visits, it became more difficult to coordinate visitation. In addition, Father V. got a job which conflicted with his scheduled visitation time. Although Father V., his parents, and Aunt tried to work out an alternate time for

visitation, they were unable to coordinate schedules. Instead of petitioning the court for an alternative visitation time, Father V. decided to forego visitation and wait for the legal custody hearing.

{¶22} The children had been in the temporary custody of Aunt and Uncle for over a year by the conclusion of the legal custody hearing. Aunt and Uncle were meeting all their basic needs. All three children were happy and thriving. Their living environments had become stable. In addition, Aunt and Uncle facilitated Mother's and Father V.'s involvement in the children's lives. They provided schedules of extracurricular activities to the parents, so they could attend events if they so desired. In addition, Aunt picked up Mother and took her to I.A.'s medical appointments whenever Mother was available and wanted to attend. Aunt testified that, although I.A. has six or seven medical appointments each month, Mother typically attends no more than one per month.

{¶23} A.M. told the guardian ad litem that he did not want to leave Aunt's and Uncle's home, particularly as he had been in their care for most of his life. R.M. told the guardian that she wants to visit and play with Mother, but she did not indicate a desire to live with Mother. Due to I.A.'s medically-related speech deficiencies, he was not able to express his wishes to the guardian. The guardian recommended that Aunt and Uncle be awarded legal custody of all three children and that the agency's protective supervision be terminated. The LCCS caseworker asserted that the agency supported Aunt's and Uncle's motions for legal custody of the children.

{¶24} Neither Mother nor Father V. had filed motions for legal custody. On the first day of hearing, Father V. testified that he supported an award of legal custody of A.M. to Aunt and Uncle. On the third day of hearing three months later, he testified that he believed that Aunt and Uncle no longer had A.M.'s best interest at heart. He explained that Aunt told him she

would look to see what day would work to accommodate Father V.'s schedule for visitation after Father V. obtained a job and had to work on his court-ordered visitation day. Father V. interpreted Aunt's statement as indicative of an uncooperative attitude, although he did not explain why Aunt's assertion that she would work to find a day that worked for visitation was adverse to either his ability to see the child or the best interest of A.M. Father V. concluded that he believed that it was in A.M.'s best interest to be either in his legal custody or in Mother's legal custody. In the alternative, he requested a standard order of visitation. He added that his parents are no longer willing to supervise his visitation.

{¶25} Father V. has an extensive criminal history, including convictions for sexual battery, failure to register as a sex offender, felony assault, misdemeanor assault (against a former live-in girlfriend), attempted burglary, probation violations, drunk and disorderly, and trespassing. He was still on probation for misdemeanor assault at the time of the hearing.

{¶26} He shares a two-bedroom apartment with a current girlfriend. Father V.'s other son (a 13-year old) by another woman stays with them 3-5 days a week, even though that child's mother has legal custody. Father V. has a part-time job earning approximately $400 per month, as well as "under-the-table" opportunities that may be available. His rent is $550 per month. In addition, he is $2000 in arrears on child support for his other child, and $10,000 in arrears on child support for A.M. He also owes over $1000 in municipal court fines. Father V. admitted that he is unable to meet his own basic needs, let alone those of a child or two, without the help of his girlfriend of ten months.

{¶27} Father V. has been a long-time user of marijuana, and testified that he and Mother have smoked marijuana together "numerous, countless times." On the third day of the hearing, he claimed to have stopped using marijuana, and testified that he had not used in 27 days. Three

months earlier, he had testified that he last smoked marijuana 17 days prior. LCCS had not conducted any recent drug tests on Father V. to confirm his drug use, because he admitted to the caseworker that he was a regular marijuana smoker and planned to remain so.

{¶28} Father V. asserted that he was ready to take A.M. home, because he has adequate living space and food, there is no domestic violence or "bad traffic" in his home, he works, and he has all the "creature comforts" including a swimming pool and a house full of electronics. He described A.M. as a "self-reliant" child who requires no special tending. Father V. has no valid driver's license, and relies on his girlfriend for transportation.

{¶29} Although Father V. also supported an award of legal custody of A.M. to Mother, he admitted that she does not make the best decisions, has "things that she may need to work out," and needs counseling. He testified that he believed the child nonetheless would be safe with Mother, because he would be fed, clothed, enrolled in school, and have the opportunity to see his father. Father V. testified that Mother's bad choices have only been "self-destructive," rather than harmful to her children.

{¶30} The caseworker, guardian ad litem, and Aunt and Uncle all expressed concerns about Mother's ability to care for the children. Specifically, they had concerns about Mother's friends, which include drug users and physical abusers; the cluttered and dirty living conditions in her home; Mother's drug abuse and mental health issues; and her inability to meet the basic needs of the children, including the inability to provide adequate supervision. LCCS developed a case plan which the juvenile court adopted as an order. Mother's case plan objectives included that Mother: (1) submit to a drug and alcohol assessment, follow all recommendations, and submit to screens; (2) submit to a mental health assessment and follow all recommendations; and (3) meet the basic needs of the children, including learning to provide adequate supervision and

maintaining safe and clean conditions in the home. Home safety issues also concerned Mother's association with people who were violent, used drugs, and had extensive criminal histories. As part of her mental health objective, Mother was required to thoroughly discuss and address her victimization in domestic violence situations, particularly those arising with her live-in boyfriend M.K.

{¶31} Mother obtained a mental health/drug and alcohol assessment at Firelands, which recommended individual weekly or biweekly counseling. Mother was quickly terminated from that program in March 2015, because she failed to attend two sessions in a row. She then submitted to a new assessment in May 2015, at Psych and Psych, where she was diagnosed with anxiety issues, chronic post-traumatic stress disorder, and cannabis and alcohol dependency, for which intensive outpatient treatment was recommended. It was also recommended that Mother see a psychiatrist. Because Mother's social anxiety militated against group counseling, Mother's counselor determined that she would need to first address her mental health issues before addressing her substance abuse issues. Mother's current treatment plan does not address domestic violence issues and instead focuses on immediate issues, rather than historical ones.

{¶32} Although she was to attend biweekly counseling sessions, Mother only attended four sessions in four months. Her counselor testified that she had ten more sessions left in her treatment program. The counselor rated Mother's prognosis as fair to good, noting that Mother is engaged and invested in her treatment. Both the counselor and Mother conceded, however, that based on Mother's attendance, she would likely require another ten months to complete those sessions. Furthermore, Mother testified that she was not sure that those ten additional sessions would be enough to address her issues. Uncle agreed that Mother's mental health issues were not under control. He raised concerns about Mother's mean alter ego, who Mother refers to

as "Elizabeth." Mother explained that "everybody becomes a different person when they're mad, not just me." In addition, Mother never scheduled an appointment with a psychiatrist. Accordingly, she had not completed the mental health component of her case plan, was unlikely to have completed it in another six months, and had not even begun to comply with her substance abuse treatment objective.

{¶33} Mother further failed to resolve her issues as a victim of domestic violence. The caseworker observed her once during the case with a black eye. Although Mother told her that I.A. had head-butted her during visitation, Mother later admitted that M.K. had hit her. M.K. was in prison at the time of the legal custody hearings, after being convicted of breaking and entering and burglary at Aunt's and Uncle's home. Although Mother vehemently asserted that she was no longer in a relationship with M.K., her former abuser, three authenticated recent emails from someone with Mother's full name to M.K. in prison were read into the record. In all, there were approximately 20 emails sent between M.K. and someone with Mother's name, according to a prison employee with authority to monitor such communications at the prison where M.K. was held. Mother admitted to sending one email to M.K. to tell him to send someone to pick up his belongings from her home and that she was sorry he had to deal with the hardships of prison life, but she denied knowing anything about the other emails which expressed affection. Mother speculated that M.K.'s current girlfriend hacked Mother's email account and sent emails to M.K., referencing circumstances particular to Mother, expressing never-ending love, and signing off with Mother's name. Although Mother asserted she had no plans to reunite with M.K. upon his release from prison, she admitted that she still loved him even though he destroyed her life, because they had been together for so long (6 years).

{¶34}  Aunt expressed concerns that Mother and M.K. would in fact reunite when he was released from prison in a few months based on her history and ongoing contact with him.  Aunt explained that Mother had a history of engaging in relationships with men who were violent.  The caseworker also noted Mother's poor relationship choices which had resulted in numerous acts of domestic violence.  Mother and her child, B.M., both told the caseworker that Mother is currently in a relationship with someone.  Mother refused to identify the man, however, because she did not believe the caseworker had any business knowing.

{¶35}  During the case, Mother never participated in any drug or alcohol treatment programs.  Although her mental health counselor advised delaying substance abuse treatment until Mother had completed her mental health component, Mother was still required to submit to drug screens.  She tested positive for cocaine once during the case, and positive for marijuana once in the midst of the legal custody hearings.  In addition to the above-referenced domestic violence issues with M.K., Mother and he spent a lot of time smoking marijuana together, typically behind their bedroom door, thereby impacting Mother's ability to supervise her children.

{¶36}  Mother was evicted from the home she had been renting from Aunt and Uncle for four years. Uncle testified that she had failed to pay rent, brought dogs into the property in violation of the lease, and generally allowed the environment in the home to deteriorate to the point that she was living "in squalor."  Mother denied she failed to pay rent.  She immediately obtained alternate housing and was apparently current in her rent payments there.  The home has four bedrooms, beds for the children, and adequate food, although the caseworker found it to be very cluttered, with dog feces on the floor, despite the caseworker's visit having been announced.  Aunt testified that in the past she had helped Mother clean her home, on one

occasion removing 35 bags of trash from the upstairs level alone and finding marijuana and multiple pipes in Mother's bedroom.

{¶37} Based on a review of the evidence, this is not the exceptional case where the finder of fact clearly lost its way and created a manifest miscarriage of justice in awarding legal custody of A.M., R.M., and I.A. to Aunt and Uncle. The critical inquiry before awarding legal custody is to consider the current parenting abilities of each potential custodian and to determine whether it is in the best interest of the children to be placed in the legal custody of any of them. *See In re K.C.*, 9th Dist. Summit Nos. 26992, 26993, 2014-Ohio-372, ¶ 20.

{¶38} The evidence in this case established that Mother had struggled with mental health and substance abuse issues throughout the lives of these children. She admitted that she has not resolved her mental health issues and that she would likely require ongoing, long-term counseling. She has not even begun to address her substance abuse issues, which historically prevented her from properly supervising her children. Mother continued to smoke marijuana, even during the course of the three-day legal custody hearing over three months. She has an extensive history with LCCS, and her three older children are all in the legal custody of other relatives. Although Mother has a part-time job, she does not earn enough to allow her to meet the basic needs of the children. She has routinely relied on Aunt for financial support to pay necessary expenses. Mother no longer has a car, and has frequently missed appointments due to lack of transportation. Most unfortunately, Mother has a history of engaging in relationships with men who subject her to domestic violence. She continued to maintain contact with her most recent abuser even while he was in prison for burglarizing Aunt's and Uncle's home. The children stand to be exposed to continued violence in the home, should they be returned to Mother's legal custody.

**{¶39}** Father V. played no part in A.M.'s life for approximately nine years. He has never paid child support for A.M., and owes approximately $10,000 in arrearages for that child alone. He is also behind in child support payments for another child. Father V. only recently obtained part-time employment after not working in six years. He admitted that he could not afford to provide for his own basic needs, let alone the needs of a child, without the help of his live-in girlfriend. He has an extensive criminal history, including convictions for assault against a girlfriend and a sexually oriented offense.

**{¶40}** On the other hand, Aunt and Uncle have cared for A.M. for most of his life. They continued to provide for the basic needs and beyond of all three children after they were placed in their home. The children are bonded with Aunt and Uncle, and the two older children have expressed a desire to remain with Aunt and Uncle. A.I. could not express his wishes due to certain developmental delays, but witnesses testified that his multiple medical needs were being met and he was thriving in Aunt's and Uncle's care. Aunt and Uncle have expressed every intent to cooperate with Mother and Father V. to allow them the opportunity to visit with the children and attend extracurricular activities. Aunt routinely transports Mother to any of I.A.'s medical appointments she wishes to attend. Neither the caseworker nor the guardian ad litem had any concerns regarding the use of excessive discipline by Aunt and Uncle. Both the caseworker and the guardian recommended legal custody to Aunt and Uncle as being in the children's best interest. Under the circumstances, the juvenile court's finding that an award of legal custody to Aunt and Uncle was in the children's best interest was not against the manifest weight of the evidence.

**{¶41}** Moreover, this Court has held that "'[w]here the trial court finds that it is in the best interest of a child to be placed in legal custody as a permanent disposition, the trial court

must necessarily deny an extension of temporary custody.'" *In re B.C.*, 2014-Ohio-2748, at ¶ 22, quoting *In re C.M.*, 9th Dist. Summit No. 24380, 2009-Ohio-943, ¶ 24. Because we upheld the juvenile court's finding that an award of legal custody to Maternal Aunt and Uncle was in the children's best interest, we further conclude that the juvenile court did not abuse its discretion by denying Mother's request for a six-month extension of temporary custody.

{¶42} Mother's first and third assignments of error are overruled.

### III.

{¶43} Mother's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
DONNA J. CARR
FOR THE COURT

TEODOSIO, J.
CALLAHAN, J.
CONCUR.


APPEARANCES:

DENISE FERGUSON, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and EMILY W. KIRSCH, Assistant Prosecuting Attorney, for Appellee.

WAYNE R. NICOL, Attorey at Law, for Appellees.

CLAUDE THOMPSON, Guardian ad Litem.

FATHER V., father of A.M.