[Cite as *In re A.D.*, 2026-Ohio-524.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# UNION COUNTY

IN RE:

A.D.,

ADJUDICATED NEGLECTED AND
 DEPENDENT CHILD.

[ELI D. - APPELLANT]

CASE NO. 14-25-27

OPINION AND
JUDGMENT ENTRY

Appeal from Union County Common Pleas Court
Juvenile Division
Trial Court No. 2023JC053

Judgment Affirmed

Date of Decision:  February 17, 2025

APPEARANCES:

    *Alison Boggs* for Appellant

    *Brian C. Cook* for Appellee

**WILLAMOWSKI, J.**,

{¶1} Respondent-appellant Eli D. ("Father") brings this appeal from the judgment of the Court of Common Pleas of Union County, Juvenile Division, granting legal custody of A.D. to his paternal aunt. Father claims on appeal that the trial court's judgment is against the manifest weight of the evidence and that he was denied the effective assistance of counsel. For the reasons set forth below, the judgment is affirmed.

{¶2} In 2011, A.D. was born to Father and Jennifer M. ("Mother"). Mother died in 2019. On December 20, 2023, Union County Department of Job and Family Services ("the Agency") filed a complaint alleging that A.D. was a neglected and dependent child. The Agency claimed that A.D. was homeless and that A.D. and Father were residing in the Super 8 Motel. The Agency also alleged that Father had on-going paranoia, a major depressive disorder, and anti-social personality disorder, as well as substance abuse issues. The Agency was concerned about A.D. due to reports from Franklin County Children Services indicating that A.D. was no longer participating in his online schooling and was being isolated by Father. The Agency reported attempting to develop a safety plan for A.D., but Father refused to cooperate. As a result of Father's mental health issues, lack of stable housing, Father's drug usage, and A.D.'s failure to attend school, the Agency requested the trial court find A.D. to be a neglected and dependent child. The trial court granted

an ex parte order of custody and A.D. was removed from Father's custody on December 20, 2023. Although the Agency originally placed A.D. in foster care, he was moved into his maternal grandmother's home on December 28, 2023.

{¶3} On January 2, 2024, the trial court appointed Diane Nelson ("Nelson") as the guardian ad litem for A.D. An adjudicatory hearing was held on February 26, 2024. Following the hearing, the trial court found A.D. to be a neglected and dependent child. A dispositional hearing was then held on March 1, 2024. The trial court ordered that A.D. remain in the temporary custody of the Agency with placement with the maternal grandmother to be appropriate. The trial court then ordered Father to 1) sign releases of information for the Agency and Nelson, 2) complete a parenting class, 3) submit to an "AOD assessment" and follow the recommendations, and 4) work to find affordable and safe housing. On March 7, 2024, the Agency removed A.D. from the maternal grandmother's home after she notified the Agency that she no longer felt safe with A.D. in the home. A.D. was placed with a licensed foster family.

{¶4} A case review was conducted in June of 2024. In the review, the Agency noted that Father had completed an inpatient treatment program and was linked with the Marion County Veteran's Association for his mental health needs. The Agency also noted that Father had enrolled in a parenting program and signed a release to allow the Agency to receive information from the program. Father presented the Agency with a photo of his certificate of completion of the program.

However, the Agency noted that Father expressed concern with what the Agency was reporting about Father and claimed they were not taking A.D. to medical appointments. Father also claimed he left his prior residences due to criminal activity on the premises. The review also indicated that A.D. had mental health issues that needed to be addressed through counseling. The Agency noted that Father had secured housing through September 2024 and claimed to be engaged in counseling. However, Father had not signed the releases for the Agency to verify the counseling claims.

{¶5} On July 25, 2024, the Agency took A.D. to visit Father in Columbus. At the end of the visit, Father refused to allow A.D. to leave, insisting he needed emergency care and stated he was calling 911 to report child abuse. Father insisted that the child be examined at Nationwide Children's Hospital and took A.D. there without the Agency's consent. On August 7, 2024, a motion to show cause was filed requiring Father to appear and show why he should not be held in contempt.

{¶6} On August 9, 2024, the trial court conducted an in camera interview with A.D. Afterwards, a review hearing was held at Father's request. Father testified that he was concerned that the Agency was not seeing to A.D.'s medical needs and claimed that A.D. had developed pneumonia in June or July and had knee issues which were not addressed. Father also claimed that A.D. had been suffering from hallucinations and suicidal thoughts. Father alleged that the Agency was abusing A.D. Father also claimed that he had signed all of the required releases, but

the Agency and Nelson indicated they had not been able to view any of the records. The Agency indicated that A.D. had been taken to doctor's offices for the complaints Father listed. Following the testimony, the trial court determined that it would be in A.D.'s best interest to remain in the temporary custody of the Agency at that time.

{¶7} On December 20, 2024, A.D. was moved from the foster home to the home of his paternal great-aunt, Vera H. ("Vera"). The Agency filed a motion on January 23, 2025, to modify the disposition and award legal custody of A.D. to Vera. The motion noted that A.D. had been living with Vera since December 20, 2024, and that Vera had signed the statement of understanding of her responsibilities if she were to be awarded legal custody of A.D. A hearing was held on the motion on May 29, 2025. The following evidence was presented at the hearing.

{¶8} Ashton Clark ("Clark") testified that she was the on-going case worker assigned to A.D.'s case. The Agency's goals for A.D. were for A.D.'s mental health needs be addressed, he attend school regularly, and that he have a safe and stable living environment. A.D. moved to Vera's home on December 20, 2024 and adjusted well to living with Vera. A.D. reported feeling safe and comfortable in that home. A.D. had regularly attended school since living with Vera and earned excellent grades. Vera ensured that A.D. attended his monthly counseling appointments.

{¶9} As to Father, the Agency was concerned that Father and A.D. lacked a stable living environment and that Father had mental health issues. Over the course of the case plan, Father had not consistently engaged in services for his mental health issues, had not maintained consistent communication with the Agency, and had not provided the records requested. Clark admitted that Father's last drug screen, conducted on December 19, 2024, was negative for any illegal or non-prescribed substances. According to Clark, Father's psychological evaluation revealed a diagnosis of "major depressive disorder; unspecified anxiety disorder; and an unspecified personality disorder with cluster B traits; methamphetamine use disorder, and reported remission; and alcohol use disorder, and reported remission." Tr. 16. The doctor who conducted the evaluation recommended that Father seek substance use treatment and mental health services, including an assessment for mental health medication. When Clark attempted to address the assessment and recommendations, Father insisted there were no recommendations made and refused to participate in any future services regarding his mental health and substance issues.

{¶10} Clark testified that Father had maintained housing during the review period, but had indicated that he would be moving. Although Father had allowed Clark inside the home on two occasions, she indicated that Father did not allow observation of the entirety of the apartment. As a result, Clark was unable to determine if the home was safe and appropriate for A.D. to reside there.

{¶11} Clark further testified that the visits between Father and A.D. were positive and successful. Father would bring games for A.D. and father to play. Clark also indicated that Father and A.D. speak on the phone or text each other daily. Although there is a positive relationship between A.D. and Father, Clark testified that it would be in A.D.'s best interest to grant legal custody to Vera.

> So [A.D.] has been placed with Vera for six months now. And prior to that, he was having overnight weekend visitation and things like that. So he's had a relationship with Vera, an extensive relationship with Vera for a while now. He's adjusted well to her home. He's been engaged in services, engaged at school. Doing phenomenally well at school. He has maintained with all of, you know, with his counselor at Nationwide. And we have now had custody of [A.D.] for, I think, if my math is correct, for 16 to 18 months. And so it's time for him to have permanency as we have not seen the progress towards the case plan goals that we need regarding [Father] in order for [Father] to provide a safe and stable living environment for [A.D.].

Tr. 30-31. Although Father had made some progress, he had not fully completed any of the case plan requirements. Father's willingness to work the case plan was inconsistent.

{¶12} On cross-examination, Clark admitted that the second parenting class recommended by the doctor was not because of concerns with parenting ability, but rather was a specialized class regarding parenting a child with autism since there were signs that A.D. may be autistic. Clark also admitted that Father had completed a release for his medical records that had not been revoked and that the records had reportedly been sent several weeks prior, but had yet to be received by Clark. When asked, Clark indicated that A.D. had stated he wished to reside with Father.

{¶13} Vera testified that she is the aunt of Father and that A.D. was living with her at the time of the hearing. According to Vera, A.D. was doing well in the home and at school. Vera testified that she supports A.D. and Father continuing to have a relationship. Vera anticipated A.D. and Father being able to visit on the weekends or during the week after school. If visits were to go well, Vera would like to see A.D. reunified with Father. However, Vera indicated that she understood she could not just "return" A.D. to Father without the court's approval.

{¶14} Salma Abdellatif ("Abdellatif") testified, when called by Father, that she was the outpatient therapist working with A.D. since 2020. According to Abdellatif, A.D. idolizes Father. Father was very concerned that A.D. was not doing well emotionally after the death of his mother and wanted to make sure that A.D.'s mental health was "taken care of." Abdellatif testified that over the years, she had concerns about Father's parenting of A.D. and had reported such to the Agency back in 2023. The basis for the report was concern for A.D.'s safety based upon Father claiming they were being stalked or followed and reports of random people coming into the apartment. Nothing came of the report due to a determination that it was unsubstantiated. Abdellatif had no concerns regarding physical abuse of A.D. by Father. Since living with Vera, A.D. has consistently attended his appointments. According to Abdellatif, A.D. has indicated the following preferences.

> [A.D.] has voiced, you know, he loves his dad very much. He would love to be with his dad. Going back to what [Clark] also said earlier

though, if you know, that is not an option, he feels safe and happy at Vera's as well.

Tr. 81. Abdellatif indicated it was important for A.D. and Father to continue to have contact. However, Abdellatif was unable to make any recommendations as to where A.D. should be placed.

{¶15} On cross-examination, Abdellatif admitted that in the past she has had concerns regarding Father's mental health. Since A.D. has been living with Vera, he seemed to be more calm and at ease. A.D. was opening up more in therapy since the move. Abdellatif indicated that the consistency in structure has been beneficial for A.D. Abdellatif also indicated that Father has worked very well with her to try and help A.D. When Father had custody, he came to every session, but has not come since as he is not permitted to do so. However, Father calls her after every one of A.D.'s appointments. Abdellatif noted that she had seen a great improvement in A.D.'s mental health since he moved in with Vera.

{¶16} Father testified that he was unable to make visits because of the extreme cost of transportation to come to Union County from his home in Franklin County. However, Father indicated that he has daily conversations with A.D. since he went to Vera's. Vera bought A.D. a phone so that the two of them can have regular contact. Father admitted that he was angry with the Agency because he believed that they had no intention of returning A.D. to him from the beginning. His home had two bedrooms and two baths, so plenty of room for A.D. However,

Father indicated he was moving the next day because the apartment was too expensive.

**{¶17}** Father testified that he was attending AA meetings for his alcohol addiction. Father denies using any elicit substances since August of 2024 and claimed that he had tested clean during regular screens at the VA.

**{¶18}** Father testified that he should be awarded custody because it would be in A.D.'s best interest. Although he does not have a problem with Vera, she is elderly and he believes A.D. will do better with him and his friends.

**{¶19}** Following the testimony of Father, counsel for A.D. placed A.D.'s wishes on the record. A.D. indicated that he wished to be with Father. However, if that was not possible, he wished to remain in the care of Vera. Nelson recommended that the motion for legal custody to Vera be granted.

**{¶20}** On June 10, 2025, the trial court issued its ruling granting the Agency's motion to award legal custody of A.D. to Vera. Father appeals from this judgment and raises the following assignments of error on appeal.

### First Assignment of Error

**The trial court's decision is against the manifest weight of the evidence. Appellee did not use reasonable efforts to prevent the continued removal of the minor child and failed to prove by clear and convincing evidence that the court should grant its motion for legal custody of the minor child to the paternal great-aunt.**

**Second Assignment of Error**

**[Father] was denied the effective assistance of counsel during his hearing as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.**

*Manifest Weight of the Evidence*

{¶21} In the first assignment of error, Father claims that the judgment of the trial court awarding legal custody to Vera was against the manifest weight of the evidence. An award of legal custody will not be reversed as long as the judgment is supported by a preponderance of the evidence. *In re A.M.*, 2017-Ohio-7653 (9th Dist.). To determine whether the trial court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. An appellate court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶22} If a trial court has adjudicated a child as abused, neglected, or dependent, it may grant legal custody to any person who requests custody of the child. R.C. 2151.353(A)(3). "'Legal custody vests in the custodian the physical care and control of the child while residual parental rights and responsibilities

-11-

remain intact' and '[u]nlike permanent custody, granting legal custody does not terminate the parent-child relationship.'" *In re J.T.*, 2019-Ohio-4520, ¶ 16 (3d Dist.) quoting *In re M.M.*, 2011-Ohio-3913, ¶ 7 (12th Dist.). The decision to grant legal custody of a child is based upon the best interest of the child. *Id*. "A court may therefore consider the relevant best interest factors set forth in either R.C. 3109.04(F) or R.C. 2151.414(D) as guidance in determining the best interest of the child." *Id*. These factors include such things as 1) the relationships of the child; 2) the wishes of the child; 3) the wishes of the parents; 4) the child's adjustment to the home, school, and community; 5) the mental and physical health of all involved persons; 6) the willingness of parties to honor and facilitate visitation; and 7) any other relevant factor. See R.C. 3109.04(F) and R.C. 2151.414(D).

{¶23} Here, the testimony was clear and the trial court found that Father and A.D. have a strong bond and love each other. A.D.'s position that he wished to live with Father was also presented to the trial court. Father told the trial court that he wished to have A.D. live with him as well. However, the testimony showed that at the time of the hearing, Father had not completed the therapy required of him and was about to be moving to a new home. Although Father testified that he was moving the next day, he presented no evidence regarding the home to which he would be moving. The testimony presented showed that Father was still engaged in a pattern of instability at the time of the hearing. Abdellatif testified that this instability was not good for A.D.

**{¶24}** In comparison, the testimony showed that A.D. was thriving in Vera's home. Clark, Vera, and Abdellatif all testified that A.D. was making progress with his therapy, was attending school regularly, had improved his grades, and had even made a friend. Abdellatif testified that she had seen A.D. as being calmer and more at ease. She noted that A.D. told her that if he could not live with Father, he wanted to remain in Vera's home. Notably, even Father indicated that A.D. was doing well in Vera's home and also indicated that he was having more communication with A.D. due to A.D. being with Vera. Vera testified that she wanted to protect A.D., but also wanted A.D. and Father to have a good relationship. According to Vera, she ultimately would like to see A.D. reunited with Father, but in the meantime she was willing to care for A.D. and provide him with the stability he needed. Given the evidence presented at the hearing, the evidence does not show that the trial court lost its way creating a manifest miscarriage of justice. To the contrary, the record indicates that the trial court appropriately considered the best interest of the child and properly determined that awarding legal custody to Vera was in A.D.'s best interests at that time. The first assignment of error is overruled.

*Ineffective Assistance of Counsel*

**{¶25}** In the second assignment of error, Father claims that he was denied the effective assistance of counsel when counsel failed to obtain exhibits regarding Father's compliance with the case plan and submit the evidence of such to the trial court. To establish an ineffective assistance of counsel claim, a defendant must

demonstrate (1) that counsel's performance fell below an objective standard of reasonable representation and (2) that he was prejudiced by that performance. *Strickland v. Washington*, 466 U.S. 668 at 687-688 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

{¶26} Initially, this Court notes that generally parties are unable to attack civil judgments on the basis of ineffective assistance of counsel. *In re L.A.*, 2024-Ohio-1241 (3d Dist.). Although the issue of ineffective assistance of counsel may be raised in cases involving the permanent custody or adoption proceedings, it generally has not been extended to proceedings involving other custody issues. *Id. See also, In re L.J.W.*, 2016-Ohio-7054 (5th Dist.) and *In re C.M.C.*, 2021-Ohio-314 (8th Dist.). *But See In re C.L.*, 2024-Ohio-616 (12th Dist.) (holding that father is entitled to effective assistance of counsel in legal custody proceedings) and *In re L.L.*, 2022-Ohio-44962 (9th Dist.) (evaluating counsel's effectiveness in legal custody case).

{¶27} In this case, we need not address this issue. Even if we were to determine that Father was entitled to an evaluation of the effectiveness of his counsel, the claim would fail. As discussed above, the record supports the determination that A.D.'s best interest at this time was served by placing A.D. with

-14-

Vera. The information which Father claims should have been presented would not have changed the fact that Father was moving out of his apartment the next day and presented no testimony as to where he was going. It also would not have shown that Father could provide the stability that Vera was providing. The evidence supported that at the time of the hearing, granting legal custody to Vera with liberal visitation between Father and A.D. was in A.D.'s best interest. Thus, Father is unable to show that but for the alleged deficiency, the result of the hearing would have been different. Failure to establish the second element means that the ineffective assistance of counsel claim would fail. For this reason, the second assignment of error is overruled.

{¶28} Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Court of Common Pleas of Union County, Juvenile Division, is affirmed.

*Judgment Affirmed*

**MILLER and WALDICK, J.J., concur.**

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.  The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  *See* App.R. 30.

 

 

_____
John R. Willamowski, Judge

 

_____
Mark C. Miller, Judge

 

_____
Juergen A. Waldick, Judge

DATED:
/hls